Filed 1/11/23  P. v. Stewart CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B313986 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA151337) |
| v. | |
| DARNELL TREALL STEWART, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Sean D. Coen, Judge.  Affirmed.

Charles Thomas Anderson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Stacy Schwartz and Colleen M. Tiedemann, Deputies Attorney General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Darnell Treall Stewart appeals from an order for the execution of a previously imposed four-year state prison sentence. The trial court suspended execution of that sentence after Stewart pleaded guilty in July 2020 to one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)).[1]  For the next year, Stewart failed to comply with virtually any conditions of probation.  In March 2021, Stewart admitted to violating the terms and conditions of his probation in a different courthouse before a different judge from the one who imposed the original sentence.  In July 2021, Stewart appeared in the original courthouse on an additional probation violation.  That judge found Stewart in violation of probation and executed the state prison sentence.  Stewart contends the sentence violated his plea bargain with the People at the prior March 2021 probation hearing.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Stewart's Underlying Offense and Sentence*

By information filed March 13, 2020, the People charged Stewart with kidnapping (§ 207, subd. (a); count 1), assault with a deadly weapon (§ 245, subd. (a)(1); count 2), injuring a spouse, dating partner, or co-parent (§ 273.5; count 3), and making criminal threats (§ 422, subd. (a); count 4).  As set forth in a February 28, 2020, probation report, these charges arose from an incident on February 3, 2020, between Stewart and Vanessa

---

[1]     Statutory references are to the Penal Code unless otherwise stated.

2

Ruiz, his dating partner of 10 months.  Stewart and Ruiz argued in a motel room when Ruiz questioned whether Stewart "had been sleeping with other women."  In the course of the argument, Ruiz left the room, and Stewart followed.  He pushed her to the ground, took her cell phone out of her purse, and threw it to the ground, breaking it.  Stewart then kicked Ruiz and stomped on her legs.  As she tried to escape, Stewart picked her up off the ground and held a knife to her abdomen, stating, "If you keep trying to run, I'm going to kill you."  Stewart forced Ruiz back to the motel and began to undress her.  She then escaped.  Stewart was on parole at the time of these events.

On July 1, 2020, Stewart appeared in the Los Angeles County Superior Court in the South Central District courthouse in Compton.  Given Stewart's lengthy and violent criminal record, the probation report recommended "a sanction that will act as a deterrent against this type of behavior," and suggested a state prison sentence.  Pursuant to a negotiated disposition, Stewart pleaded no contest to assault with a deadly weapon (count 2).  As part of the stipulated sentence, instead of the prison sentence recommended by the probation report, Stewart agreed that the court would sentence him to the upper term of four years in state prison, with execution of that sentence suspended.  Stewart further agreed to a five-year probation term, with certain conditions.  Among them, Stewart agreed to complete a 52-week domestic violence prevention program, abide by a 10-year protective order, and abide by all terms and conditions of probation including, relevant here, to "obey all laws and orders of the court."

The court emphasized to Stewart the importance of complying with probation: "You are embarking on a responsibility, commitment to the court that you are going to comply with the terms and conditions of probation . . . . I want to make sure that you understand that you have a responsibility. This is a fantastic offer that's been made by the People, crafted by your smart lawyer. But you [are going to] have to comply with this. If you don't, then you [are going to] be standing right there in yellow." Stewart responded, "All right." After the court said, "Make sure you understand me," Stewart's public defender confirmed with Stewart, "You understand?" to which Stewart replied, "Yes, sir."

Later in the plea proceeding, the court summarized Stewart's obligations and warned again that any probation violation would result in execution of the state prison sentence:

> "Court: Now I read, I'm sure, a mouthful. It's a lot for you to digest, understand, absorb. But there are the fines and fees and terms and conditions of probation. And the two major ones – really three – are to report to probation as you are supposed to, go to the [domestic violence] program, and stay away from Ms. Ruiz. You violate any terms and conditions of probation and you'll be back in jail again, sir. I want to make sure you understand that. And you'll be going to state prison.
>
> "[Stewart]: Yes."

A short time later, Stewart's lawyer again emphasized the point: "Also, I want to remind him that I filled out a little

4

probation referral form with a lot of information, my number, what he's pled to, that he's going to prison for four years if he even jaywalks." After some further comments from his lawyer, and additional colloquy, the court again confirmed, "You understand all of that? Mr. Stewart, you understand all of that?" to which Stewart replied, "Yes, Sir." Finally, the court offered one last blunt reminder: "The last thing you want to do is see Ms. Ruiz or don't go that program or don't go to the probation department and you [are going to] have a bad day. You [are going to] be standing right there in yellow and you are going to state prison."

Stewart received credit for time served of 147 actual days in custody.

2. *Stewart's Initial Performance on Probation*

Stewart next appeared in court on July 31, 2020, when he provided proof of enrollment in the domestic violence program. The court ordered him to ensure probation approved the program, and to return on November 9, 2020, with a progress report from the program. Stewart failed to appear as ordered on November 9, resulting in revocation of probation and the issuance of a no-bail bench warrant. The next day the court recalled and reissued the warrant, holding it until November 18, after Stewart reportedly came to court but left ill before his counsel arrived. Stewart appeared on November 18, but without the ordered proof of enrollment in the domestic violence counseling program. The court ordered him to appear on December 22 with proof of enrollment. On December 22 Stewart appeared late but with the requisite proof of enrollment,

5

resulting in the reinstatement of probation and an order to appear with a progress report on March 22, 2021.

    3. *Stewart Resolves a New Case in a Different Courthouse*

On February 9, 2021, Stewart failed to appear for his arraignment in the El Monte courthouse on a new misdemeanor charge for violating the protective order prohibiting contact with Ruiz and a corresponding petition to revoke probation in the instant case. The court summarily revoked probation and set a probation violation hearing for February 23.

After several continuances, Stewart appeared on March 10, 2021, in El Monte. The court had before it a probation report prepared for the February 9 court date. The report characterized Stewart's performance on probation as "poor," citing his new arrest, his failure to stay in contact with probation since December 2020, and his failure to progress in his domestic violence counseling requirement.[2] It recommended a jail sanction if the court found Stewart in violation of probation.

In another negotiated disposition, Stewart admitted the probation violation for an agreed 90-day jail sentence and dismissal of the new misdemeanor case. As the court explained:

> "What you'll be doing today is if you admit to the felony violation, the People are willing to dismiss your open misdemeanor here. You'll have to serve 90 days in the county jail, and, upon release, you will remain on felony

---

[2]    The report's additional reference to a failure to enroll in an anger management program appears to arise from confusion over the way the sentencing court characterized the domestic violence counseling program.

probation. You'll have to reenroll in the domestic violence counseling and just be mindful that on this felony case you have four years suspended."

The court then took Stewart's plea. Stewart admitted to "failing to abide by the terms and conditions [of probation], specifically violating the protective order and picking up this new misdemeanor case." After taking Stewart's plea, the court modified probation to include the stipulated 90-day jail sentence, reinstated probation "under the same terms and conditions," and confirmed with Stewart that he "accepted and understood" those terms and conditions. At the request of Stewart's lawyer, the court set a remand date for April 9, 2021, and directed Stewart to appear at his existing March 22 date in Compton. Because only the Compton court purportedly could vacate the March 22 date, and because Stewart practically could not reenroll in the domestic violence counseling class until after he completed his 90-day jail sentence, he needed to ask the Compton court for a future date for that purpose. As the court put it after taking the probation violation admission:

> "You need to go to Compton on March 22nd, 2021. And just let them know, I'll note it in the file as well, that you have a surrender date on April 9th, and that you'll need a future court date so that you can return to get reenrollment paperwork, if necessary, or show proof of reenrollment in your domestic violence counseling class so that you are letting the Court know that you are abiding by the terms and conditions of probation by being in your domestic violence counseling class."

4. *The Compton Court Orders Execution of the Four-year Suspended Sentence Based on Stewart's Probation Violations*

On the morning of March 22, 2021, the day set by both the Compton and El Monte courts for Stewart to appear in the Compton courthouse, Stewart failed to appear. The court revoked probation and issued a bench warrant. Then at 1:30 p.m. that day, Stewart's counsel appeared remotely and represented that Stewart was "in the hallway as he does not feel well." The court recalled and reissued the warrant, holding it until April 6. The probation report prepared for the March 22 appearance again characterized Stewart's performance on probation as "poor," referencing Stewart's failure to communicate with probation since December 2020, Stewart's failure to keep an appointment with probation on February 8, and his "unknown" status in the domestic violence program. The report recommended community service, an admonishment to complete domestic violence counseling, and monthly telephonic contact with his probation officer.

On April 6, 2021, Stewart again failed to appear, resulting in the issuance of a no-bail bench warrant. Stewart did appear for his jail remand on April 9, 2021, to serve the probation sentence pursuant to his March 10 plea agreement in the El Monte courthouse.

Stewart then appeared in custody at the Compton courthouse for a bench warrant hearing on May 3, 2021. The court recalled the warrant and ordered a supplemental probation report. After a further continuance, Stewart requested a probation violation hearing, which the court set for July 8, 2021.

On July 8, Stewart appeared, still in custody, for the probation violation hearing. The supplemental probation report ordered by the court deemed Stewart's progress on probation "unsatisfactory." It recounted that Stewart had "failed to make any contact with this [probation] officer or the probation department" prior to his April 9 remand, was terminated from his domestic violence class in December 2020, and failed to provide proof of anger management counseling. The court read and considered this report.

Stewart's lawyer essentially conceded the violation: "the only reason the court would be imposing prison would be for his failure to return to the court date before he surrendered. And that's a valid concern," and Stewart "accepts he has not met his obligation . . . . He shouldn't get a free pass."[3] Stewart's counsel agreed "there's a risk to safety," but he urged that the "extenuating circumstances" of Stewart's condition on March 22 should result in reinstatement and modification of probation to include a new substance abuse treatment program. Counsel explained that when Stewart arrived to court several hours late on March 22, he "was having some type of either illness or mental health episode based on some new medication," which "then led to some serious confusion about the next court date." Stewart's counsel offered to call the bailiff as a witness to Stewart's condition on March 22.

---

[3] At the hearing, the People seemed to agree that the violation before the court involved Stewart's failure to appear, stating, "I believe the scope of the probation violation hearing that the court was considering was just that Mr. Stewart did not return to court."

9

The court stated it did not need the bailiff's testimony, and accepted counsel's representation of what happened on March 22, noting (as to the failure to appear) "[a]nd that's one aspect of why we're here." The court then found Stewart in violation of his probation, explaining:

> "[Stewart] did not come to court the last court appearance in our matter, but I do understand the extenuating circumstances that were described to me. However, the culmination of things here, the picking up of the new case but which was already addressed, but in our supplemental report he simply never checked in with probation. It's been a year to date, thereabouts, and nothing was done in this matter. And I am very concerned about the public safety issue as well."

The court then invited comments regarding sentencing. Stewart's counsel urged the court not to impose the state prison sentence because Stewart already had admitted to the violation that led to the new misdemeanor case and had served that sentence. Instead, Stewart's counsel suggested the court "just impose some custody time" and allow Stewart to attend the treatment program counsel had arranged. The district attorney submitted on his prior comments that "I'm going to submit at what the court had indicated at the previous court date as to what to do today," and that looking at Stewart's performance on probation overall, he did not see Stewart as "a good candidate for any new terms of probation" because "he hasn't shown any indication that he will complete those."

In ordering execution of the four-year state prison sentence, the court acknowledged "the issues that Mr. Stewart had suffered," but weighed those issues against "the safety concerns I have here at least for the public" and a "second chance, a third chance, and a fourth chance" that the court felt Stewart had while on probation without success.

Stewart timely appealed.

## DISCUSSION

1. *Standard of Review and Applicable Law*

Neither party addresses the proper standard of review. To the extent Stewart challenges the probation revocation decision, we apply a substantial evidence standard of review. (*People v. Urke* (2011) 197 Cal.App.4th 766, 773, citing *People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 681 ["We review a probation revocation decision pursuant to the substantial evidence standard of review."].) In doing so, we accord "great deference" to the trial court's decision because "the granting and revocation" of probation lies "'entirely within the sound discretion of the trial court.'" (*Urke,* at p. 773.) "On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (See *People v. Jones* (1990) 51 Cal.3d 294, 314.)

To the extent Stewart challenges the sentence, "[s]entencing choices such as the one at issue here, whether to reinstate probation or sentence a defendant to prison, are reviewed for abuse of discretion. 'A denial or a grant of probation generally rests within the broad discretion of the trial court and will not be disturbed on appeal except on a showing that the

11

court exercised its discretion in an arbitrary or capricious manner.'" (*People v. Downey* (2000) 82 Cal.App.4th 899, 909.) The defendant has the burden to demonstrate an abuse of discretion. (*People v. Vanella* (1968) 265 Cal.App.2d 463, 469.)

Section 1203.2 permits the court to terminate probation "if the interests of justice so require and the court, in its judgment, has reason to believe from the report of the probation officer or otherwise that the person has violated any of the conditions of his or her probation." (§ 1203.2, subd. (a).) The court may revoke "upon its own motion" or a petition by the probation officer, among others. (*Id.* at subd. (b)(1).) "Upon any revocation and termination of probation . . . if the judgment has been pronounced and the execution thereof has been suspended, the court may revoke the suspension and order that the judgment shall be in full force and effect. (*Id.* at subd. (c).)

"'[A] negotiated plea agreement is a form of contract and is interpreted according to general contract principles.'" (*K.R. v. Superior Court* (2017) 3 Cal.5th 295, 304, citing *Doe v. Harris* (2013) 57 Cal.4th 64, 69.) "Experience and practice can, in some circumstances, lead courts to recognize the incorporation of implied terms to a contractual agreement." (*K.R.,* at p. 304, citing *Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1178-–1179.) If contractual language is clear and explicit, it governs. (*People v. Shelton* (2006) 37 Cal.4th 759, 767.) However, if the contract terms ""are in any respect ambiguous or uncertain"" the court must then interpret the contract ""in the sense in which the promisor believed, at the time of making it, that the promisee understood it"" based on "objective manifestations of the parties' intent.'" (*Ibid.,* citations omitted.) In determining the parties' mutual

intent, the court considers the "'surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties.'" (*Ibid.*, citations omitted.)

2. *The March 10 Plea Bargain Extinguished Stewart's Violations as of That Date*

Stewart concedes he had violated the conditions of his probation several times by March 10. However, he argues that when he admitted the probation violation for violating the domestic violence restraining order on March 10, it necessarily and impliedly immunized him for any other violation up to that point even if not expressly part of his admission.

The People disagree that Stewart's March 10 plea bargain included any implied terms. The People contend the "bargain" meant the court would dismiss Stewart's misdemeanor case in exchange for his probation violation admission, but the agreement did not address or include terms regarding his other probation violations. Stewart has the better argument.

The People acknowledge that a plea bargain can contain implied terms if "supported by the record." Here, the People argue, the March 10 plea bargain must be limited to its express terms because the parties did not discuss other prior probation violations. The People cite only to *People v. Paredes* (2008) 160 Cal.App.4th 496 in support of this interpretation of events. In *Paredes*, the sentencing court agreed to recommend against deportation. (*Id.* at p. 498.) After a post-sentencing change in federal law resulted in removal proceedings, the defendant asserted his plea bargain included an implied term protecting him from deportation. (*Ibid.*) The circumstances of the plea in

*Paredes* did not support a finding that anyone had made a "no deportation" promise. To the contrary, the prosecutor denied expressly making such a promise, and "the trial court admonished Paredes that he *could* be deported as a result of his plea." (*Id.* at p. 511.) Finally, the fact that the prosecutor did not have the legal power to bind the federal government further supported the conclusion that the plea agreement included no such promise, express or implied. (*Id.* at p. 512.)

The circumstances here differ for several reasons. First, although the parties did not expressly address the *effect* of Stewart's admission on his other outstanding violations, the parties and the court did discuss Stewart's other violations at the March 10 hearing. Stewart's counsel initially requested that the court vacate the March 22 date in Compton because Stewart could not serve his 90-day sentence and simultaneously remain enrolled in a domestic violence class. When advised that only the Compton court could modify the March 22 date, the court agreed to "note it in the file" that Stewart had an April 9 surrender date so Stewart could appear in the Compton court on March 22 to "get reenrollment paperwork, if necessary, or show proof of reenrollment in your domestic violence counseling class." This discussion implies that the court contemplated reenrollment in the class, not further violation proceedings relating to it. The court also reinstated Stewart's probation, incorporating the prior terms and conditions, which a court would not typically do if it anticipated further violation proceedings. Finally, Stewart admitted to "failing to abide by the terms and conditions [of probation], specifically violating the protective order and picking up this new misdemeanor case." Although the court "specifi[ed]" the protective order violation, it also made general reference to

14

Stewart's failure to abide by the "terms and conditions." To the extent this language is ambiguous, the court's actions in reinstating probation and directing Stewart to reenroll in domestic violence classes after his 90-day jail sentence, taken collectively, strongly suggest the parties "mutually intended" that the admission would address Stewart's failures up to that point. (See *K.R. v. Superior Court*, *supra*, 3 Cal.5th at p. 304.) The "subsequent conduct" of the parties corroborates this interpretation. The prosecutor made no mention of, and took no steps to pursue, additional violation proceedings until Stewart later failed to comply with an order to appear in court. (*People v. Shelton, supra,* 37 Cal.4th at p. 767.)

3. *The July 8 Sentence Did Not Violate the Implied Agreement from March 10*

Stewart contends that the July 8 sentence in Compton violated an implied term of the plea bargain he reached on March 10 in El Monte by using pre-March 10 violations to find Stewart in violation of probation. The People argue that the court properly could rely on all violations identified in the supplemental probation report it ordered, which included Stewart's termination from the domestic violence program on December 22, 2020, and his failures to communicate with his probation officer. The People further contend that even if the March 10 El Monte plea agreement prevented the Compton court on July 8 from relying on any pre-March 10 violations, Stewart still committed additional violations between March 10 and July 8 sufficient to support the trial court's findings. We find that sufficient evidence supports the finding of a probation

15

violation on July 8 and that the court did not abuse its discretion in ordering execution of the state prison sentence.

### a. *Substantial evidence supports the probation violation finding at the July 8 hearing*

A trial court need only find a violation of probation by a preponderance of the evidence. (*People v. Rodriguez, supra,* 51 Cal.3d at p. 442.) But "the evidence must support a conclusion the probationer's conduct constituted a willful violation of the terms and conditions of probation." (*People v. Galvan* (2007) 155 Cal.App.4th 978, 982.) Where evidence is uncontroverted that a probationer did not fail to appear due to "irresponsibility, contumacious behavior or disrespect for the orders and expectations of the court," the trial court may abuse its discretion if it uses that failure to appear as the basis to revoke probation. (*People v. Zaring* (1992) 8 Cal.App.4th 362, 379.)

The court's July 8 recitation of reasons to find Stewart in violation of his probation references both pre-March 10 and post-March 10 conduct. After discussing the failures to appear, the court refers to "the culmination of things here," going on to list "the picking up of the new case but which was already addressed," and the "supplemental report he simply never checked in with probation." Stewart contends the court's consideration of pre-March 10 violations invalidates its finding that Stewart violated probation.[4] When discussing the failures to

---

[4] The People argue Stewart forfeited any challenge to the court's consideration of these violations by failing to object in the trial court. However, the People confuse the failure to object to consideration of these factors at *sentencing* (which the court could validly do), with consideration of them as the basis for the

appear and the reasons for them, the court stated, "And that's one aspect of why we're here." Although not a model of clarity, that comment and the other references do not necessarily imply the court relied on pre-March 10 violations when finding Stewart in violation of probation on July 8. But even if the court did so, we only look to whether substantial evidence supports the court's decision. If it does, it is harmless error that the court may also have relied on improper material.

The record contains evidence of three possible probation violations after March 10—failures to contact his probation officer and two failures to appear—all referenced by the court at the probation revocation hearing. The probation report prepared for the March 22 hearing indicated that Stewart should telephonically contact his probation officer monthly. The supplemental report ordered by the court on April 6 indicates that Stewart "failed to make any contact" with his probation officer before his remand to county jail on April 9. Thus, Stewart failed to contact his probation officer for approximately one month.

Stewart points to language differences between the supplemental probation report and earlier reports to suggest probation did not instruct him to contact probation after the March 10 hearing. Viewing the evidence in the light most favorable to the People, as we must, the more reasonable interpretation is that probation instructed Stewart to report to his probation officer monthly, but he consistently failed to do so – right up until the July 8, 2021, hearing. It makes no sense that after Stewart failed to report to probation between December 23,

---

violation itself. Thus, *People v. Scott* (1994) 9 Cal.4th 331, 356, cited by the People, does not apply.

17

2020 and his March 10, 2021, plea bargain, probation would not instruct him to report regularly from that point forward. The March 22, 2021, report suggests that instruction was to report monthly. He did not, according to the supplemental report, contact probation in the month between the March 10, 2021, hearing and his April 9, 2021, remand to county jail (a span that includes his failure to appear on March 22 and April 6). The trial court specifically referenced Stewart's failure to report when finding him in violation of probation on July 8, 2021. At a minimum, the trial court could "reasonably deduce from the evidence" that Stewart failed to report as directed *after March 10*, and we therefore must presume the existence of that fact. (*People v. Jones, supra,* 51 Cal.3d at p. 314.) This failure alone would constitute substantial evidence in support of the court's finding on July 8 that Stewart violated probation after March 10.

In addition, Stewart failed to appear in court twice after March 10, 2021: first on March 22 (though he appeared later that day), and then again on April 6. Stewart's counsel essentially conceded these failures, as he had to. However, Stewart's counsel offered uncontradicted evidence, including a proffer of the bailiff's testimony, that Stewart had mental health issues caused by medication on March 22 that made him late and prevented him from entering the courtroom. The court accepted counsel's representations as true. In its findings, the court explained that on March 22 Stewart "did not come to court . . . but I do understand the extenuating circumstances that were described to me."

18

Stewart argues these comments indicate the court made a finding that the "extenuating circumstances" excused Stewart's failure to appear and rendered the failure not willful. Except that the court never expressly found that Stewart's failure was not willful. Understanding the extenuating circumstances does not exclude a finding that Stewart willfully failed to appear. Both could be true. Viewing the evidence in the light most favorable to the People, the court had no obligation to find Stewart's failure to appear resulted from "irresponsibility, contumacious behavior or disrespect for the orders and expectations of the court" before concluding that the failure was willful.[5] (*People v. Zaring, supra,* 8 Cal.App.4th at p. 379.)

But even if the uncontradicted evidence proffered by Stewart required the court to excuse Stewart's failure to appear on March 22, the same evidence does not excuse his next failure to appear on April 6. Stewart's counsel argued that Stewart's issues on March 22 then "led to some serious confusion about the next court date." However, the evidence proffer of the bailiff's testimony did not extend to the reasons why Stewart failed to appear on April 6. The bailiff only observed Stewart on March 22. Stewart's counsel's argument that Stewart's condition

---

[5]    In *People v. Zaring, supra,* 8 Cal.App.4th 362, the court held that an order revoking probation was erroneous. Although the defendant appeared 22 minutes late for a court-ordered appearance, she presented uncontradicted evidence at her probation revocation hearing that unforeseen circumstances out of her control and parental responsibilities prevented her from appearing on time. (*Id.* at p. 379.) The facts here are quite different. Stewart had a record of failing to appear, never appeared in the courtroom on March 22, and offered no evidence why he failed to appear on April 6.

19

on March 22 somehow affected his ability to appear on April 6 relies on sheer speculation.  Thus, even if we excuse the March 22 failure to appear as a basis to revoke probation, substantial evidence supports a finding that the April 6 failure to appear was willful and a proper basis to revoke probation.  Given the multiple failures to appear, and the nature of the evidence submitted by Stewart, this is not the "very extreme case" where we should "interfere" with the trial court's decision to revoke probation.  (*People v. Rodriguez, supra,* 51 Cal.3d at p. 443.)

### b. *The court did not abuse its discretion when it imposed the state prison sentence*

Because substantial evidence supports the finding that Stewart violated his probation, the court did not abuse its discretion in ordering executing of the state prison sentence.  The court warned Stewart in clear terms that any violation could result in execution of the sentence.  That, too, was the bargain Stewart made.  The court properly considered Stewart's overall poor performance on probation and the public safety concerns acknowledged as a valid concern by Stewart's counsel.  Stewart has not met his burden to show the court abused its discretion.  (*People v. Vanella, supra,* 265 Cal.App.2d at p. 469.)

## DISPOSITION

The judgment of the superior court is affirmed.


HOWARD, J.*


We concur:


PERLUSS, P. J.


FEUER, J.

---

*     Judge of the Marin County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.